IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| NATIONAL RIGHT TO WORK LEGAL DEFENSE AND EDUCATION FOUNDATION, INC., aka NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC., <br><br>      Plaintiff, <br><br> vs. <br><br> GARY R. HERBERT, Lieutenant Governor of the State of Utah, in his official capacity, <br><br>      Defendant. | **MEMORANDUM OPINION AND ORDER** <br><br> Case No. 2:07-CV-809 <br><br> Judge Dee Benson |

Plaintiff National Right to Work Legal Defense and Education Foundation, Inc. (the "Foundation") brought the present lawsuit challenging, both facially and as applied, the constitutionality of Utah Code Annotated ("UCA") §§ 20A-11-101(7)(a)(ii) (definition of "corporation"), 20A-11-101(28)(b) (definition of "political issues committee"), and 20A-11-101(30)(a)(ii) (definition of "political issues expenditure"). These statutes impose disclosure and reporting requirements on all organizations that make campaign related expenditures in the state of Utah. The Foundation is seeking declaratory and permanent injunctive relief with respect to these statutes and expungement from all Utah State records of any documents the Foundation was required to file under Title 20A (the "Election Code") of the Utah Code. On February 15, 2008, the Foundation filed the present motion for summary judgment, arguing as a matter of law, that these statutes are vague and overbroad in violation of the First and Fourteenth Amendments of the United States Constitution. Oral argument was held on June 30, 2008.

James Bopp, Jr. of Bopp, Coleson & Bostrom represented the Foundation.  The state of Utah was represented by Thomas D. Roberts of the Utah Attorney General's Office.

## I.  FACTUAL BACKGROUND

In February 2007, the Utah Legislature passed H.B. 148, entitled Education Vouchers. H.B. 148, 57th Leg., Gen. Sess., 2007 Utah Laws 4.  This bill established a school voucher system in which children would be provided with state-funded scholarships to attend eligible private schools.  These state-funded scholarships ranged in amount from $500 to $3,000 depending on the size and annual income of the child's family.  Unlike other voucher systems around the country, Utah's did not limit these state-funded scholarships to the economically disadvantaged.  All children in the state of Utah, no matter their economic status, were eligible for at least $500 in vouchers.

This new law was met with significant opposition.  Almost immediately after H.B. 148 was signed into law by Utah's Governor, opponents of school vouchers began a petition drive pursuant to UCA § 20A-7-201(2)[1] in an effort to gather enough signatures to subject the new law to a vote by the people.  By April 12, 2007, enough signatures had been gathered to force a ballot

---

[1]UTAH CODE ANN. § 20A-7-201(2):

   (20)(a) A person seeking to have an initiative submitted to a vote of the people for approval or rejection shall obtain:
   (i) legal signatures equal to 10% of the cumulative total of all votes cast for all candidates for governor at the last regular general election at which a governor was elected; and
   (ii) from each of at least 26 Utah State Senate districts, legal signatures equal to 10% of the total of all votes cast in that district for all candidates for governor at the last regular general election at which a governor was elected.
   (b) If an initiative petition meets the requirements of this part and the lieutenant governor declares the initiative petition to be sufficient, the lieutenant governor shall submit the proposed law to a vote of the people at the next regular general election.

initiative, and on May 9, 2007, Utah's Governor announced that H.B. 148 would be on the ballot in the November 2007 General Election as Referendum 1.

This ballot initiative prompted extensive debate, not only among voters in the state of Utah, but also nationwide. *See, e.g.*, Richard D. Kahlenberg, *Balkanizing Utah's Schools*, POLITICO, (October 31, 2007), http://www.politico.com/news/stories/1007/6656.html ("The vote has national implications not only for education but also for presidential politics."). It became the subject of a vigorous ad campaign – with Parents for Choice in Education leading the charge in favor of the initiative and the Utah Teacher's Association leading the charge in opposition – and was consistently discussed in both local and national newspapers. *See, e.g.*, George F. Will, *The Challenges of School Choice*, MIAMI HERALD, Nov. 1, 2007, at A17; *Voucher Showdown*, WALL ST. J., Aug. 29, 2007, at A14; Lisa Schencker, *Vouchers the Villain at UEA*, SALT LAKE TRIB., Oct. 30, 2007. Nearly $8 million was spent campaigning for and against the initiative. Bob Bernick Jr. & Jennifer Toomer-Cook, *Upward of $8M Spent on Vouchers*, DESERET MORNING NEWS, Nov. 8, 2007, at A1. In the end, Referendum 1 was defeated; with 62% voting against it and only 38% voting in favor. *Id.*

The Foundation is a nonprofit legal aid organization dedicated to defending "the rights of workers who are suffering legal injustice as a result of employment discrimination under compulsory unionism arrangements, and to assist such workers in protecting rights guaranteed to them under the Constitution and laws of the United States . . . ." Foundation Articles of Incorporation, Art. III.2, Verified Complaint, Exhibit B. In March of 2007, the Foundation began receiving complaints from teachers and other public school employees claiming that they were being harassed and intimidated by labor union agents to sign petitions opposing the

recently enacted school voucher law and calling for a referendum to have it repealed.  Letter

from Richard J. Clair to Michael J. Cragun (May 4, 2007) ("Clair Letter II"), Verified

Complaint, Exhibit I.  In an effort to inform public school employees of their rights and to

oppose the Union, the Foundation ran an ad campaign of its own.

     This campaign consisted of both a radio advertisement and a television advertisement.

The text of the radio advertisement, which ran from March 30 to April 11, 2007, was as follows:

> Recently, teacher union officials have launched a state-wide political blitz in
> Utah's public schools.  Their goal?  To sabotage a popular new law meant to
> improve the quality of education for Utah's children.
>
> If you are a teacher or school employee, you have the right not to participate in
> the union's petition drive.  In fact, the attorney general's office has just warned
> that the use of school time or resources for politics violates Utah's criminal laws.
> If you are pressured by a union activist, you have the legal right to say no –
> without fear of union retaliation.  For free legal aid, contact the National Right to
> Work Foundation at 1-800-336-3600.  Or righttowork.org.
>
> It's just plain wrong for union bosses or any special interest group to misuse our
> public schools to promote their narrow political agenda.  You have rights.  Once
> again, that's 1-800-336-3600.  Or righttowork.org.

Verified Complaint, Exhibit D.

     The text of the television advertisement, which was broadcast from April 4 to April 9,

2007, contained similar text.  It stated:

> Teacher union officials have launched a state-wide political blitz to block a new
> law meant to improve the education of Utah's children.
>
> Teachers or school employees: you have the right not to participate in the union's
> petition drive.  In fact, the attorney general's office has just warned that using
> school time or resources for politics violates Utah law.
>
> If you are pressured by a union activist, you have the right to say no – without
> fear of retaliation.  For free legal aid, visit righttowork.org.

Verified Complaint, Exhibit E.

In the midst of these advertisements being broadcast, on April 3, 2007, Michael J. Cragun, Deputy Director of the Utah Lieutenant Governor's Office, sent a letter to the Foundation warning it that its advertisements may be subject to the reporting requirements of the Utah Election Code.  Letter from Michael J. Cragun, Deputy Director, State of Utah Office of the Lieutenant Governor, to Raymond J. LaJeunesse, Jr. (April 3, 2007), Verified Complaint, Exhibit F.  Mr. Cragun explained that "[b]ecause the suggestion has arisen that your advertisements are subject to the requirements [of the Campaign and Financial Reporting chapter of the Utah Election Code], I am enclosing for your reference the definitions section and Political Issues Committees – Registration and Financial Reporting part of this chapter of the code."  *Id*.  Also included with the letter were forms for registering as a political issues committee.  *Id*.

Title 20A of the Utah Code imposes substantial financial disclosure requirements on political issues committees.  UTAH CODE ANN. § 20A-11-802.  A "political issues committee" is defined as "an entity . . . that . . . makes disbursements to influence, or to intend to influence, directly or indirectly, any person to . . . assist in keeping a statewide ballot proposition off the ballot, or refrain from voting or vote for or vote against any statewide ballot proposition."  UTAH CODE ANN. § 20A-11-101(28)(a)(i).[2]  The Foundation immediately responded to Mr. Cragun's

---

[2]UTAH CODE ANN. § 20A-11-101(28)(a) in its entirety reads:

   (28) (a) "Political issues committee" means an entity, or any group of individuals or entities within or outside this state, that solicits or receives donations from any other person, group, or entity or makes disbursements to influence, or to intend to influence, directly or indirectly, any person to:
   (i) assist in placing a statewide ballot proposition on the ballot, assist in keeping a statewide ballot proposition off the ballot, or refrain from voting or vote for or vote against any statewide ballot proposition; or

letter by explaining that it is not a political issues committee.  Letter from Richard J. Clair,

Corporate Counsel for the Foundation, to Michael J. Cragun (April 4, 2007), Verified Complaint,

Exhibit G.  Rather, it is a "legal aid organization offering free assistance to any public employees

who might be coerced or intimidated in the exercise of their political rights by union agents."  *Id*.

The Lieutenant Governor's Office, however, did not relent.  On April 25, 2007, Mr.

Cragun sent another letter to the Foundation explaining:

> In the opinion of this office, the radio and television advertisements that your
> organization ran in Utah earlier this month demonstrate that it is [a political issues
> committee].  Specifically, we believe that references to: "sabotage a popular new
> law," "petition drive," and "narrow political agenda" fit the advertisements within
> the political issues expenditures definition of UCA § 20A-11-101(30).[3]

Letter from Michael J. Cragun to Richard J. Clair (April 25, 2007) ("Cragun Letter II"), Verified

Complaint, Exhibit H.  Mr. Cragun went on to explain that as a political issues committee, the

Foundation was required to file an initial statement of organization under UCA § 20A-11-

---

(ii) sign or refuse to sign an incorporation petition or refrain from voting, vote for , or
vote against any proposed incorporation in an incorporation election.

[3]UTAH CODE ANN. § 20A-11-101(30)(a):

(30) (a) "Political issues expenditure" means any of the following:
(i) any payment from political issues contributions made for the purpose of influencing
the approval or the defeat of a statewide ballot proposition;
(ii) a purchase, payment , distribution, loan, advance, deposit, or gift of money made
for the purpose of influencing the approval or the defeat of a statewide ballot proposition;
(iii) an express, legally enforceable contract, promise, or agreement to make any
political issues expenditure;
(iv) compensation paid by a reporting entity for personal services rendered by a person
without charge to a political issues committee; or
(v) goods or services provided to or for the benefit of another reporting entity at less
than fair market value.

801(1)(b)(ii)[4] and a series of financial disclosures throughout the year under UCA § 20A-11-802.[5]  Mr. Cragun advised that the Lieutenant Governor's Office was "willing to entertain the argument" that the Foundation fit within the corporate exception of the political issues committee definition.  UTAH CODE ANN. § 20A-11-101(28)(b)(v) ("Political issues committee" does not mean . . . a corporation, except a corporation whose apparent purpose is to act as a political issues committee.").  However, because its advertisements constituted political issues

---

[4]UTAH CODE ANN. § 20A-11-801(1)(b)(ii):

   (b) If a political issues committee is organized after the January 10 filing date, the political issues committee shall file an initial statement of organization no later than seven days after:
   . . .
   (ii) disbursing political issues expenditures totaling at least $50.

[5]UTAH CODE ANN. § 20A-11-802 provides in part:

   (1) (a) Each registered political issues committee that has received political issues contributions totaling at least $750, or disbursed political issues expenditures totaling at least $50 during a calendar year on current or proposed statewide ballot propositions, to influence an incorporation petition or an incorporation election, or on initiative petitions to be submitted to the Legislature, shall file a verified financial statement with the lieutenant governor's office:
   (i) on January 5, reporting contributions and expenditures as of December 31 of the previous year;
   (ii) seven days before the date of an incorporation election, if the political issues committee has received donations or made disbursements to affect an incorporation;
   (iii) March 1;
   (iv) June 1;
   (v) at least three days before the first public hearing held as required by Section 20A-7-204.1;
   (vi) at the time the sponsors submit the verified and certified initiative packets to the county clerk as required by Section 20A-7-206;
   (vii) on September 15; and
   (viii) seven days before the regular general election.

expenditures, even as a corporation the Foundation would be required to make disclosures under UCA § 20A-11-702.[6]  *Id*.

The Foundation again responded by letter, claiming that it is neither a political issues committee nor a corporation making political issues expenditures.  Clair Letter II (May 4, 2007), Verified Complaint, Exhibit I.  The Foundation explained that it is a nonprofit, charitable, legal aid *corporation*.  Section 20A-11-101(28)(b)(v) expressly excludes corporations from the definition of political issues committee, unless the corporation's "apparent purpose is to act as a political issues committee."  *Id*.  The Foundation argued that because its purpose is to provide charitable legal aid, it meets the exclusion and is not required to register or file as a political issues committee.  *Id*.

Furthermore, the Foundation argued that it had not made any political issues expenditures.  *Id*.  The term "political issues expenditure" is defined to include a "payment . . . of money made for the purpose of influencing the approval or the defeat of a ballot proposition."  UTAH CODE ANN. § 20A-11-101(30)(a)(ii).  The Foundation contended that the purpose of its advertisements "was to offer legal aid to teachers and school employees who might be suffering from union coercion or intimidation.  The ads were not for the purpose of 'influencing the

---

[6]UTAH CODE ANN. § 20A-11-702 provides in part:

    (1) (a) Each corporation that has made political issues expenditures on current or proposed ballot issues that total at least $750 during a calendar year shall file a verified financial statement with the lieutenant governor's office on:
     (i) January 5, reporting expenditures as of December 31 of the previous year;
     (ii) March 1;
     (iii) June 1;
     (iv) September 15; and
     (v) seven days before the regular general election.

approval or the defeat of a statewide ballot proposition."  Clair Letter II (May 4, 2007), Verified

Complaint, Exhibit I (quoting UTAH CODE ANN. § 20A-11-101(30)(a)(ii)).  Thus, the Foundation

argued, it was under no requirement to file a corporate report detailing the cost of the

advertisements under UCA § 20A-11-702.  *Id.*

On May 24, 2007, the Lieutenant Governor sent a letter to the Foundation advising that,

"[a]fter reviewing the correspondence between you and Mr. Cragun, listening to the National

Right to Work Legal Defense Foundation's radio advertisements, and consulting with the Utah

Attorney General's Office, I have determined that your organization is required to file a

corporate financial report of political issues expenditures."  Letter from Gary R. Herbert,

Lieutenant Governor of Utah, to Richard Clair (May 24, 2007) ("Herbert Letter"), Verified

Complaint, Exhibit J.  In other words, the Lieutenant Governor determined that although the

Foundation was not a political issues committee, their ads constituted political issues

expenditures, requiring the Foundation to comply with the reporting and disclosure requirements

of UCA § 20A-11-702.

Accordingly, on May 31, 2007, the Foundation filed, under protest, a "Report of

Expenditures For Corporations."  Verified Complaint, Exhibit A.  The Foundation filed the

present lawsuit for declaratory and injunctive relief claiming that the Utah Election Code's

definitions of  "corporation," "political issues expenditure," and "political issues committee"

improperly regulate political speech in violation of the First and Fourteenth Amendments of the

United States Constitution.

## II.  LEGAL BACKGROUND

**A.     The Federal Election Campaign Act of 1971**

In 1971 Congress enacted the Federal Election Campaign Act ("FECA").  FECA, as

amended in 1974, imposed various limitations on individual political contributions and

independent expenditures in an effort to curb corruption – both real and perceived – in the

federal election process.  The most significant limitations in the Act prohibited individuals from

contributing more than $1,000 to any single candidate per election and from independently

spending more than $1,000 a year "relative to a clearly identified candidate."  18 U.S.C. §

608(b)(1), (e)(1) (1975).   Most pertinent to the present case, FECA also imposed disclosure

requirements on "[e]very person . . . who makes contributions or expenditures . . . in excess of

$100 within a calendar year."  2 U.S.C. § 434(e) (1975).

In 1976, the Supreme Court addressed the constitutionality of FECA in its landmark

decision *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam).  Observing that campaign finance

regulations "operate in an area of the most fundamental First Amendment activities," *id*. at 14,

the Court demarcated a clear boundary "between regulable election-related activity and

constitutionally protected political speech."  *N. C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 281

(4th Cir. 2008) (citing *Buckley*, 424 U.S. 1) [hereinafter *NCRTL*].  The Court concluded that only

those activities that are "unambiguously related to the campaign of a particular . . . candidate"

may be constitutionally regulated.  *Buckley*, 424 U.S. at 80.

For example, in examining the constitutionality of FECA's $1,000 limitation on

independent expenditures "relative to a clearly identified candidate," 18 U.S.C. § 608(e)(1)

(1975), the Court narrowly construed the language of that provision "to apply only to

10

expenditures for communications that in express terms advocate" for a candidate's election or defeat. *Id*. at 44. The Court explained that the "use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech." *Id*. at 41. Therefore, the Court held that in order to avoid invalidation of § 608(e)(1) on vagueness grounds, the $1,000 independent expenditure limitation must be read to only apply to "communications containing express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id*. at 44 n.52. These have become known as the "magic words of express advocacy." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 127 S.Ct. 2652, 2681 (2007) (Scalia, J., concurring) [hereinafter *WRTL*].[7]

With respect to 2 U.S.C. § 434(e), which imposed disclosure requirements on anyone making political contributions or expenditures in excess of $100 a year, the Court applied a similarly narrow statutory construction. The Act defined "contributions" and "expenditures" as donations of money or other valuable assets "for the purpose of . . . influencing the nomination . . . or election" of a candidate for federal office. 2 U.S.C. § 431(e), (f) (1975). The Court found this provision, as it applied to § 434(e), to be ambiguous and unnecessarily vague. *Id*. at 76-77. Particularly troublesome to the Court was the uncertainty of the phrase "for the purpose of influencing." *Id*. at 77. Recognizing, however, the legislature's purpose behind FECA's disclosure requirements, namely to insure "purity and openness of the federal election process,"

---

[7]The Court ultimately declared that § 608(e)(1) was unconstitutional – finding that limiting an individual's independent political expenditures, as distinguished from direct contributions to a candidate, was not supported by any "substantial governmental interest." *Buckley*, 424 U.S. at 47-48. However, the Court's analysis of the vagueness issue, with regard to both this provision and FECA's disclosure requirement provision, has long stood for the proposition that legislatures may only regulate those campaign communications that use the "magic words of express advocacy." *WRTL*, 127 S.Ct. at 2681 (Scalia, J., concurring).

the Court narrowly construed the provision in a manner that would precisely further this legislative goal.  *Id*. at 78.

   To do this, the Court once again applied the rule that only those activities that are "unambiguously related to the campaign of a particular federal candidate" may be regulated.  *Id*. at 80.  Accordingly, the Court defined the term "contribution" to include donations made directly to a candidate and also any expenditures made in cooperation with a candidate.  *Id*. at 78.  The term "expenditure" was more narrowly defined.  It included only those expenses that were "used for communications that expressly advocate the election or defeat of a clearly identified candidate," *id*. at 80, referring to the "magic words of express advocacy," *WRTL*, 127 S.Ct. at 2681 (Scalia, J., concurring).  This included, however, all expenditures – whether they included expenses for campaign communications using magic words of express advocacy or not – made by political committees.   The Court explained that expenditures made by organizations whose major purpose is the nomination or election of a candidate, are by definition unambiguously campaign related.  *Buckley*, 424 U.S. at 79.

   Therefore, with regard to disclosure requirements, *Buckley* held that they may be imposed on entities that are not candidates or political committees only in the following circumstances: (1) when a person makes direct contributions to a campaign or uses funds in coordination with a campaign, or (2) when a person makes independent expenditures "for communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80.  More generally, *Buckley* demarcated a "boundary between regulable election-related activity and constitutionally protected political speech: after *Buckley*, campaign finance laws may constitutionally regulate only those actions that are 'unambiguously related to

the campaign of a particular . . . candidate.'"  *NCRTL*, 525 F.3d at 281 (quoting *Buckley*, 424 U.S. at 80).

**B.**      **The Bi-Partisan Campaign Reform Act of 2002**

In 2002 Congress attempted to further curb what it saw as the corruptive influences of campaign finance by enacting the Bi-Partisan Campaign Reform Act ("BCRA").  One of BCRA's central provisions was designed to address the increased use of "issue advertising," a loophole created by *Buckley*.  *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 133 (2003). *Buckley* held that only advertisements using words of express advocacy could be constitutionally regulated.  Therefore, in order to circumvent FECA's requirements, individuals and entities began running what have been described as "issue ads."  These "issue ads," although clearly intended to influence the outcome of federal elections, did not use the "magic words of express advocacy," and thus were beyond FECA's reach as interpreted in *Buckley*.  *Id*. at 127-28.  Rather than run an ad stating "vote against John Smith," where both contribution limits and disclosure requirements would be imposed under FECA, parties would simply run an ad that condemned John Smith's record on a particular issue.  *Id*. at 126-27.  These type of ads enabled candidates to obtain potentially unlimited advertising contributions from special interest groups, and enabled wealthy individuals and organizations to anonymously influence the outcome of federal elections.  *Id*. at 128.

In an effort to close this loophole, Congress expanded the definition of express advocacy and coined a new term – "electioneering communication."  Under BCRA, any broadcast that (1) clearly identifies a candidate for federal office, (2) is made within 60 days of a general election or 30 days of a primary election, and (3) is targeted to a relevant audience of at least 50,000, is

13

subject to disclosure requirements and other limitations.  2 U.S.C. § 434(f)(3)(A)(i) (defining "electioneering communication"); 2 U.S.C. § 434(f)(1) (imposing disclosure requirements on such communications); 2 U.S.C. § 441b(b)(2) (making it a crime for any labor union or corporation to use its general treasury funds to pay for an "electioneering communication"). After the enactment of BCRA, parties could no longer avoid disclosure for advertisements run close to a federal election by simply failing to use the magic words of express advocacy.

The constitutionality of the regulations imposed by BCRA on all "electioneering communications" was challenged in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Plaintiffs argued that *Buckley* "drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." *Id*. at 190.  The Supreme Court of the United States found, however, that the two categories of speech were "functionally identical in important respects." *Id*. at 126.  Specifically, because both types of ads were being used "to advocate the election or defeat of clearly identified federal candidates." *Id*.  The Court explained that the mere "presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad." *Id*. at 193.

Accordingly, the Court upheld the disclosure requirements and other limitations BCRA imposed on "electioneering communications."  The Court found that issue ads broadcast just before federal elections which clearly identify a particular candidate were the "functional equivalent of express advocacy." *Id*. at 206.  Regulation of such ads, therefore, "fit within *Buckley's* unambiguously campaign related standard" and were constitutional.  *NCRTL*, 525 F.3d at 281.

14

Seven months after the Supreme Court issued its decision in *McConnell*, Wisconsin Right to Life, Inc. ("WRTL"), a nonprofit, ideological advocacy corporation, sought to have further clarification regarding what constituted a constitutionally regulable campaign communication under BCRA. *WRTL*, 127 S.Ct. 2652 (2007). In July 2004, WRTL began a lobbying campaign to end the use of filibusters in the United States Senate over judicial nominees. *Id.* at 2660. This campaign included both radio and television advertisements exhorting listeners to "[c]ontact Senators Feingold and Kohl and tell them to oppose the filibuster."[8]  *Id.*

WRTL intended to run these ads throughout August 2004 and finance them through its general treasury. *Id.* at 2661. "It recognized, however, that as of August 15, [thirty] days prior

---

[8]The transcript of the first radio ad was as follows:

" 'PASTOR: And who gives this woman to be married to this man?

" 'BRIDE'S FATHER: Well, as father of the bride, I certainly could. But instead, I'd like to share a few tips on how to properly install drywall. Now you put the drywall up ...

" 'VOICE OVER: Sometimes it's just not fair to delay an important decision.

" 'But in Washington it's happening. A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote. So qualified candidates don't get a chance to serve.

" 'It's politics at work, causing gridlock and backing up some of our courts to a state of emergency.

" 'Contact Senators Feingold and Kohl and tell them to oppose the filibuster.

" 'Visit: BeFair.org

" 'Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising and not authorized by any candidate or candidate's committee.' " *WRTL*, 127 S.Ct. at 2660.

to the Wisconsin primary" – a primary in which Senator Feingold was running unopposed for

reelection – "the ads would be illegal 'electioneering communications' under BCRA." *Id*.

WRTL nonetheless believed that these ads were true issue ads, protected from

government regulation under the First Amendment. *Id*. Therefore, on July 28, 2004, WRTL

filed suit against the Federal Election Commission arguing that BCRA's prohibition on the use

of corporate treasury funds for "electioneering communications" was unconstitutional as applied

to these ads. *Id*.

In addressing WRTL's claim, the United States Supreme Court determined that WRTL's

ads clearly met the definition of "electioneering communication" under BCRA. *Id*. at 2663. The

ads identified by name a candidate running for federal office and the ads were intended to be run

within thirty days of the primary. "The only question, then, [was] whether it [was] consistent

with the First Amendment for BCRA . . . to prohibit WRTL from running these . . . ads." *Id*. In

other words, the Court had to analyze whether these particular electioneering communications

were the "functional equivalent of express advocacy." *McConnell*, 540 U.S. at 206.

To determine this, the Court developed an objective standard, one that would "reflec[t]

our 'profound national commitment to the principle that debate on public issues should be

uninhibited, robust, and wide-open.'" *WRTL*, 127 S.Ct. at 2665 (quoting *Buckley*, 424 U.S. at

14). The Court held that "an ad is the functional equivalent of express advocacy only if the ad is

susceptible of no reasonable interpretation other than as an appeal to vote for or against a

specific candidate." *Id*. at 2667. Applying this standard to the ads at issue, the Court found that

although WRTL's ads were technically "electioneering communications" under BCRA, they

were not the functional equivalent of express advocacy and thus, could not constitutionally be regulated. *Id.*

**C.      Summary – Where Does This Precedent Leave Us?**

The foregoing Supreme Court precedent makes clear that campaign finance laws may constitutionally regulate only those activities that are unambiguously campaign related. *Buckley*, 424 U.S. at 80.  To date, the Supreme Court has recognized only two categories of campaign communications that meet this standard. *NCRTL*, 525 F.3d at 281.   First, legislatures may constitutionally regulate campaign communications that use words of express advocacy, such as "vote for," "elect," or "vote against," in relation to a particular candidate. *Buckley*, 424 U.S. at 44 n.52.  Second, legislatures may constitutionally regulate campaign communications that are the "functional equivalent of express advocacy." *McConnell*, 540 U.S. at 206.  This latter category of regulable campaign communications has been narrowly circumscribed. *NCRTL*, 525 F.3d at 282.  To be the "functional equivalent" of express advocacy, a campaign communication must be an "electioneering communication," defined under BCRA as a "broadcast, cable, or satellite communication which refers to a clearly identified candidate" within thirty days of a primary election or sixty days of a general election, 2 U.S.C. § 434(f)(3)(A)(i), that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL*, 127 S.Ct. at 2667.

## III.  LEGAL STANDARDS

**A.      Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure allows for the entry of summary judgment if the evidence in the record shows "that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The Tenth Circuit has explained that when applying this standard the court must "examine the

factual record and reasonable inferences therefrom in the light most favorable to the party

opposing summary judgment."  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d

1238, 1241 (10th Cir. 1990).  This does not mean, however, that the existence of a mere scintilla

of evidence in support of the non-moving party's position is enough to overcome summary

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "[T]here must be

evidence in which the jury could reasonably find for the [non-moving party]."  *Id*.

**B.     Political Candidate vs. Ballot Initiative**

The analysis up to this point has dealt entirely with the constitutionality of campaign

finance laws as they relate to candidate elections.  The Utah statutes at issue, however, regulate

the influencing by individuals and entities of ballot measures.  Whether campaign finance laws

regulate candidate elections or noncandidate elections, the constitutional analysis does not

change.  Courts have consistently applied the standards articulated in *Buckley* to all types of

campaign finance regulations and have not distinguished between ballot measure elections and

candidate elections in their rationales.  *See*, *e.g.*, *Buckley v. Am. Constitutional Law Found., Inc.*

("*Buckley II*"), 525 U.S. 182, 186-87, 203-04 (1999) (recognizing that legislatures may

constitutionally regulate noncandidate elections, and upholding most of Colorado's disclosure

requirements imposed on such elections); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334,

347 (1995) ("The principles enunciated in *Buckley* extend equally to issue-based elections . . .

."); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1103 n.18, (9th Cir. 2003) ("[W]e do

not read *Buckley* to mean that only candidate-related political speech may be regulated. . . .

18

Since there are no federal initiative or referenda, the *Buckley* court never considered the

constitutionality of regulating ballot-measure advocacy."); *Richey v. Tyson*, 120 F.Supp.2d 1298,

1310 (S.D. Ala. 2000) ("*Buckley's* reference to candidates reflects only the scope of the statutory

language at issue, not the scope of constitutionally permissible regulation."); *Volle v. Webster*,

69 F.Supp.2d 171, 173-74 (D. Me. 1999) ("[A] public filing requirement in an issue-only

election is not wholly prohibited.").

## C.      Standard of Review

     *Buckley* explained that compelled disclosure imposed by the state must survive "exacting

scrutiny."  *Buckley*, 424 U.S. at 64.  The Foundation argues that "exacting scrutiny" means

"strict scrutiny."  That it must be "narrowly tailored" to serve a "compelling governmental

interest."  *See, e.g.*, *McIntyre*, 514 U.S. at 347 (dealing with disclosure requirements the Court

stated: "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold

the restriction only if it is narrowly tailored to serve an overriding state interest"); *Am.*

*Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1103-04 (10th Cir. 1997) (finding that

statutory requirement that circulators wear identification badge was "not narrowly tailored to

serve the state's asserted interest").

     The Lieutenant Governor contends that a reduced level of scrutiny applies.  The

Lieutenant Governor argues that when analyzing the constitutionally of state election laws, the

standard of review must be flexible:

> A court considering a challenge to a state election law must weigh "the character
> and magnitude of the asserted injury to the rights protected by the First and
> Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise
> interests put forward by the State as justifications for the burden imposed by its
> rule," taking into consideration "the extent to which those interests make it
> necessary to burden the plaintiff's rights.

*Burdick v. Takushi*, 504 U.S.428, 433 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789

(1983).  Applying this balancing process to the present case, the Lieutenant Governor contends

that the disclosure requirements imposed by the Utah Election Code impose a very minor burden

on the Foundation.  Defendant's Memo in Opposition, p. 20, Dkt. No. 22.  They do not prohibit

speech in anyway.  They merely require disclosure by the Foundation of who paid for the

advertisements.  Therefore, the Lieutenant Governor contends that a reduced level of scrutiny

applies, such that the regulation should be upheld if it serves a significant governmental interest.

*Id*.

          After analyzing the case law dealing with disclosure requirements, the court is persuaded

that the standard articulated in *Buckley* is the appropriate standard.  The disclosure requirements

at issue, therefore, must survive "exacting scrutiny."  *Buckley*, 424 U.S. at 64.  Although this

standard is more strict than the "intermediate" level of scrutiny the Lieutenant Governor would

have the court apply, it is also "more forgiving than the traditional understanding of [strict

scrutiny]." *Buckley II*, 525 U.S. 182, 214 (1999) (Thomas, J., concurring).  In order to be upheld,

UCA §§ 20A-11-101(7), 20A-11-101(28), and 20A-11-101(30) must have a "substantial

relation," *Buckley*, 424 U.S. at 64, to a "substantial" governmental interest, *id*. at 68.

          But as *Buckley* clearly articulated, the government possesses a substantial interest in the

regulation of political speech only when that political speech is unambiguously campaign

related.  *Id*. at 79-81.  Therefore, before applying exacting scrutiny by determining whether the

information sought by the state of Utah through its disclosure requirements bears a substantial

relation to the government's interests, the court must first determine whether the activities being

regulated are unambiguously campaign related.

## IV. ANALYSIS

The Foundation has challenged, both facially and as applied, three provisions of the Utah Election Code: (1) UCA § 20A-11-101(7)(a)(ii) (definition of "corporation"); (2) UCA § 20A-11-101(30)(a)(ii) (definition of "political issues expenditure"); and (3) UCA § 20A-11-101(28)(b) (definition of "political issues committee").  The Foundation seeks declaratory and injunctive relief with respect to these provisions and expungement from all Utah state records of any documents the Foundation was required to file under the Utah Election Code.

### A.      Standing

In May 2007, the Lieutenant Governor notified the Foundation that as a corporation making political issues expenditures, it was required to file disclosure statements with the state of Utah under UCA § 20A-11-702.  Herbert Letter (May 24, 2007), Verified Complaint, Exhibit J.  The Foundation was not subject, however, to the more onerous reporting requirements imposed on political issues committees.  *See* UTAH CODE ANN. § 20A-11-802.

The Lieutenant Governor argues that because the Foundation has never been officially classified as a political issues committee, nor has it ever been required to comply with the disclosure requirements imposed on political issues committees, the Foundation lacks standing to challenge Utah's definition of such.  UTAH CODE ANN. § 20A-11-101(28).  The Lieutenant Governor contends that an alleged injury under one provision of a statute, in this case UCA § 20A-11-702 (which requires disclosure by corporations making political issues expenditures), is insufficient to confer standing to challenge other provisions of the statute where no actual injury has occurred.  *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006).  Therefore, although the Lieutenant Governor acknowledges that the Foundation has

standing to challenge Utah's definitions of "corporation" and "political issues expenditure" – the provisions the Foundation was actually found to be subject to – he argues that it does not have standing to challenge Utah's definition of "political issues committee."

"Standing is a threshold requirement, determined with reference to both constitutional limitations on federal court jurisdiction in Article III and prudential limitations on the exercise of that jurisdiction." *Baca v. King*, 92 F.3d 1031, 1035 (10th Cir. 1996). To meet the constitutional requirements, a plaintiff must demonstrate that: (1) he has suffered an injury-in-fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In cases involving free speech rights, the requirements for standing can be somewhat lessened. *Sec'y of State of Md. v. Munson*, 467 U.S. 947, 956 (1984). But the first requirement – that the plaintiff suffer an injury-in-fact – must be satisfied. *See Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997). A plaintiff will satisfy the injury-in-fact requirement if he has demonstrated a credible and well-founded fear that the statute will be enforced against him. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Stated differently, in order to have standing to challenge UCA § 20A-11-101(28) (definition of "political issues committee"), the Foundation must show – "at an irreducible minimum" – a realistic possibility of being prosecuted under the Utah Election Code as a political issues committee, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988), or demonstrate that its free speech rights have been or will be sufficiently chilled. *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).

In its second letter to the Foundation, the Lieutenant Governor's office explained that in its opinion "the radio and television advertisements that [the Foundation] ran . . . demonstrate that it is 'an entity . . . outside this state . . . that makes disbursements to influence, or to intend to influence, directly or indirectly, any person to . . . assist in keeping a statewide ballot proposition off the ballot,'" i.e. a political issues committee. Cragun Letter II (April 25, 2007), Verified Complaint, Exhibit H (quoting UCA § 20A-11-101(28) (definition of "political issues committee")).  A more clear example of a credible and well-founded fear of future prosecution is difficult to imagine.

The Foundation was accused of being a political issues committee for engaging in the type of speech it has always engaged in and which it would like to continue to engage in. Although the ads at issue referred to Utah's school voucher law, they also clearly informed workers about their legal rights and the availability of free legal aid.  These types of public service announcements constitute a substantial part of the Foundation's marketing strategy.  The Foundation continually monitors situations around the country that may give rise to a need for its aid, and often responds by informing the relevant community that free legal aid from the Foundation is available.  However, because of fear that Utah's political issues committee definition and its attendant requirements will be enforced against it, the Foundation claims to have been discouraged from engaging in these activities in the state of Utah.

The Lieutenant Governor responds by arguing that subpart (b)(v) of the political issues committee definition explicitly excludes corporations from political issues committees.  The Lieutenant Governor contends that because the Foundation is a corporation, it is not subject to the requirements imposed on political issues committees and thus lacks standing to challenge

UCA § 20A-11-101(28).  But any purported security this corporate exception provides to the Foundation is illusory.  The exception does not apply "when the corporation is acting generally as a political issues committee."  Defendant's Memo in Opposition, p. 9, Dkt. No. 22.  And the only criteria the provision provides to separate a corporation from a political issues committee is a broad "apparent purpose" test.  UTAH CODE ANN. § 20A-11-101(28)(b)(v).  A test, which when initially applied to the Foundation, was found by the State to be a political issues committee.

The Foundation has sufficiently demonstrated standing to challenge UCA § 20A-11-101(28) (definition of "political issues committee") and its attendant requirements.  It was classified by the Lieutenant Governor's office as a political issues committee even after contending in a written letter to the State that it was not, and has been provided with no objective criteria as to what type of conduct may again classify it as such in the future.  Accordingly, the Foundation has shown a credible and well-founded fear of future prosecution under the provision, *Babbitt*, 442 U.S. at 298, which has had a chilling effect on its First Amendment protected speech.  *Ward*, 321 F.3d at 1267.

**B.      Constitutionality of Utah's Disclosure Requirements**

Narrowly drawn disclosure requirements are not only constitutional, but have been recognized as perhaps the best solution to deterring corruption in the election process.  *See Buckley v. Valeo*, 424 U.S. 1, 60 (1976).  Disclosure helps to control the "domination of the initiative process by affluent special interest groups," *Buckley v. Am. Constitutional Law Found., Inc.* ("*Buckley II*"), 525 U.S. 182, 202-03 (1999), and provides the electorate with information necessary to make an educated decision after an "open" debate.  *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196 (2003).

24

But as has been clearly stated above, the imposition of disclosure requirements is not without limitations.  Because the First Amendment "guarantee has its fullest and most urgent application precisely to the conduct of campaigns," *Buckley*, 424 U.S. at 15 (citation omitted), disclosure requirements may constitutionally be imposed only when they regulate activities that are unambiguously campaign related.  *Id.* at 80.[9]  These include: (1) contributions made by individuals or entities to a campaign or in coordination with a campaign; (2) expenditures made by individuals or entities for communications that expressly advocate for a candidate or initiative – or its functional equivalent; and (3) expenditures made by candidates and political committees.

1.      Utah's Definitions of "Corporation" and "Political Issues Expenditure"

Section 20A-11-101(7) of Utah's Election Code defines a "corporation" as a "domestic or foreign, profit or nonprofit, business organization that is registered as a corporation or is authorized to do business in a state and makes any expenditure from corporate funds for: (i) political purposes; or (ii) *the purpose of influencing* the approval or defeat of any ballot proposition."  UTAH CODE ANN. § 20A-11-101(7)(a) (emphasis added).  The term "political issues expenditure" is defined using similar language: "a purchase, payment, distribution, loan, advance, deposit, or gift of money made *for the purpose of influencing* the approval or defeat of . . . a ballot proposition."  UTAH CODE ANN. § 20A-11-101(30)(a)(ii) (emphasis added).  The

---

[9]The Lieutenant Governor contends that after *McConnell* rejected the 'magic words' test enunciated in *Buckley*, *McConnell*, 540 U.S. at 191-94, disclosure requirements are no longer constitutionally limited to unambiguously campaign related speech.  Defendant's Memo in Opposition, pp. 14-17.  But the Defendant's interpretation of *McConnell* is misguided.  Although *McConnell* did expand the definition of express advocacy to encompass more than just 'magic words,' it did not overturn *Buckley's* unambiguously campaign related standard.  To the contrary, *McConnell* found that electioneering communications as defined under BCRA were the functional equivalent of express advocacy, and thus were unambiguously campaign related. *McConnell*, 540 U.S. at 206.  It was on this basis that BCRA's disclosure requirements were upheld.

phrase "for the purpose of influencing" is identical to that used in FECA to define the terms "contribution" and "expenditure," and is the phrase that the *Buckley* Court found to be ambiguous, "pos[ing] constitutional problems." *Buckley*, 424 U.S. at 77.

Similar to FECA, Utah's statute imposes criminal liability on anyone who fails to comply with its disclosure requirements. UTAH CODE ANN. §§ 20A-11-703, 20A-11-803. "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal." *Buckley*, 424 U.S. at 77. Therefore, to avoid facial invalidity based on grounds of vagueness and overbreadth, the court must do as the Supreme Court did in *Buckley* and narrowly construe the statute. *Id*. at 78.

In accordance with Supreme Court precedent, the court finds that the phrase "for the purpose of influencing" as used in UCA §§ 20A-11-101(7)(a) and 20A-11-101(30)(b) may constitutionally apply only to those expenditures that unambiguously relate to the enactment or defeat of a particular ballot measure. As in *Buckley*, this construction fulfills the primary purpose of the statute to deter corruption by requiring disclosure. Thus narrowly construed, the statute is facially valid.

Having saved these sections facially, the court must determine whether they are constitutional as applied to the Foundation. As previously stated, disclosure requirements may constitutionally be imposed on entities making independent campaign communications only when the communications either (1) expressly advocate – by using specific election-related words – for the enactment or defeat of a particular ballot measure, *Buckley*, 424 U.S. at 80, or (2) when the communication is the functional equivalent of express advocacy. *McConnell*, 540 U.S. at 206.

26

The advertisements at issue do not meet either requirement. Although the advertisements refer to Utah's school voucher law and may even suggest the Foundation's support for it, *see* Radio Advertisement, Verified Complaint, Exhibit D ("a popular new law meant to improve the quality of education"), nowhere in the advertisements does the Foundation expressly advocate for either the success of vouchers or the failure of the petition drive. The only express advocacy in the advertisements is that of the Foundation exhorting listeners to contact the Foundation for free legal aid. *Id*.

Neither do the advertisements constitute the functional equivalent of express advocacy. "To be considered the 'functional equivalent of express advocacy,' a communication must meet two separate requirements." *NCRTL*, 525 F.3d 274, 282 (4th Cir. 2008). First, the communication must be an "electioneering communication," defined under BCRA as a "communication which refers to a clearly identified [ballot measure]" within thirty days of a primary election or sixty days of a general election. *McConnell*, 540 U.S. at 194 (quoting 2 U.S.C. § 434(f)(3)(A)(i)). Second, the communication must be "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific [ballot measure]." " *WRTL*, 127 S.Ct. 2652, 2667 (2007). *See also NCRTL*, 525 F.3d at 282-83 (4th Cir. 2008) (detailing the Supreme Court precedent as it relates to express advocacy and its functional equivalent).

The Foundation ran its advertisements in April 2007, seven months prior to the general election – the only election in which the initiative was on the ballot – and long before the time frame that would fit it within the definition of an "electioneering communication" under BCRA. Having failed the first requirement of the functional equivalent test, the Foundation's

27

advertisements are not unambiguously campaign related and thus cannot be constitutionally regulated.

The Lieutenant Governor argues that the Supreme Court precedent with respect to what constitutes the functional equivalent of express advocacy is not so limited.  The Lieutenant Governor contends that after *McConnell*, any communication deemed to be the functional equivalent of express advocacy – whether it meets BCRA's definition of "electioneering communication" or not – is constitutionally regulable.  Defendant's Memo in Opposition, pp. 15-17, Dkt. No. 22.  Relying on this interpretation of *McConnell*, the Lieutenant Governor contends that when the Foundation's ads are put in context, namely being "run in the midst of a contentious referendum signature gathering campaign,"a reasonable person hearing the ads would understand that a central purpose of the ads is to engender support for school vouchers. *Id*.  Therefore, the Lieutenant Governor argues that, when taken as a whole and considered in context, the Foundation's advertisements clearly constitute the functional equivalent of express advocacy and may constitutionally be regulated.  *Id*.

The Lieutenant Governor's functional equivalency argument is without merit.  Even were the court to expand the functional equivalent test beyond "electioneering communications" as defined under BCRA, the state of Utah would still be required to show that the Foundation's advertisements are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific [ballot measure]."  *WRTL*, 127 S.Ct. at 2667.  This is an objective test, "focusing on the substance of the communication rather than [the] amorphous" context-based, taken as whole considerations the state has proposed.[10]  *Id*. at 2666.

---

[10]The state's proposed context-based, taken as a whole approach, flies in the face of the Supreme Court's mandate for clarity.  *Id*. at 2669 n.7.  It provides no meaningful boundaries of

Applying this objective standard to the Foundation's ads, the court finds that they are not the functional equivalent of express advocacy.  Although the ads seem to support vouchers, the primary purpose of the ads was to solicit clients and inform workers of their rights with regard to union activity.  The most reasonable interpretation of the ads is not as an appeal to vote for school vouchers, but rather as an appeal to contact the Foundation for free legal aid.  "Because [the Foundation's] ads may reasonably be interpreted as something other than as an appeal to vote for" school vouchers, they are not the functional equivalent of express advocacy.  *Id*. at 2670.

The Lieutenant Governor's argument of functional equivalency fails for a second and perhaps even more fundamental reason, which is that the vagueness of the statute does not allow for such an analysis.  The only cases to engage in functional equivalent analysis are those cases interpreting statutes that are narrowly defined.  *See, e.g.*, *WRTL*, 127 S.Ct. 2652 (2007); *McConnell*, 540 U.S. 93 (2003); *NCRTL*, 525 F.3d 274 (4th Cir. 2008).  For example, *McConnell* was interpreting BCRA's definition of "electioneering communication," which was neither vague nor overbroad.  Rather, the statute clearly articulated the prohibited conduct and regulated a narrowly defined activity, namely the running of campaign ads close to an election, an activity Congress believed was the functional equivalent of express advocacy.  *McConnell*, 540 U.S. at 204-06. Similarly in *NCRTL*, the Fourth Circuit was interpreting a law intended to expand and clearly define communications that were the functional equivalent of express advocacy.  *NCRTL*, 525 F.3d at 280-81.  In both *McConnell* and *NCRTL*, the courts understood

---

regulable versus non-regulable speech, and will only lead to further disputes and litigation, *NCRTL*, 525 F.3d at 283, a result the Supreme Court explicitly wanted to avoid.  *WRTL*, 127 S.Ct. at 2666.

what activity was being regulated and could thus make a determination whether it was unambiguously campaign related as defined by Supreme Court precedent.   It was because these statutes were "neither vague nor overbroad," that they were not "required to toe the same express advocacy line" as in *Buckley*.  *McConnell*, 540 U.S. at 192.

In the present case, however, the Utah statute does not even attempt to articulate what election-related activities it believes to be the functional equivalent of express advocacy and thus regulable.  To the contrary, rather than proscribe specific election-related activities, the plain language of UCA §§ 20A-11-101(7) and 20A-11-101(30) attempts to reach every kind of political activity.  Such a broadly worded statute cannot regulate the functional equivalent of express advocacy beyond that articulated by the Supreme Court.  To allow such regulation would violate both fairness and due process.  By its very nature, any functional equivalent analysis of conduct not previously proscribed will result in post-hoc determinations, and "'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley*, 424 U.S. at 77 (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

Therefore, where, as here, courts are applying a narrowly construed statute that previously suffered from the "shoals of vagueness," *id*. at 78, a functional equivalent analysis beyond that articulated by the Supreme Court need not be reached, and *Buckley's* express advocacy standard is still viable.  *See Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 985 (9th Cir. 2004) ("*McConnell* 'left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and over-breadth in statutes which regulate more speech than that for which the legislature has

established a significant governmental interest.'") (quoting *Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004)).

Even as thus narrowly and explicitly construed, UCA §§ 20A-11-101(7) and 20A-11-101(30) impermissibly burden the Foundation's constitutional right of free expression. *Buckley*, 424 U.S. at 44. The Foundation's ads do not expressly advocate for the enactment or defeat of school vouchers, nor are they otherwise unambiguously campaign related. Accordingly, Utah's definitions of "corporation" (UCA § 20A-11-101(7)) and "political issues expenditure" (UCA § 20A-11-101(30)) as applied to the Foundation are unconstitutional.

       2.    <u>Utah's Definition of "Political Issues Committee"</u>

The state of Utah defines "political issues committee" as:

(28)(a) an entity, or any group of individuals or entities within or outside this state, that solicits or receives donations from any other person, group, or entity or makes disbursements to influence, or to intend to influence, directly or indirectly, any person to:

    (i) assist in placing a ballot proposition on the ballot, assist in keeping a ballot proposition off the ballot, or refrain from voting or vote for or vote against any ballot proposition; ....

(b) "Political issues committee" does not mean:
    ...
    (v) a corporation, except a corporation whose *apparent purpose* is to act as a political issues committee.

UTAH CODE ANN. § 20A-11-101(28)(a)-(b). The Foundation makes the same argument against UCA § 20A-11-101(28) as it has made against the prior two provisions. Specifically, that it is vague and overbroad.

The Foundation contends that the statute is vague because with respect to corporations, it fails to explain what amount of political activity a corporation may engage in before being

labeled a political issues committee.  Plaintiff's Reply Memo, pp. 11-13, Dkt. No. 23

(interpreting UCA § 20A-11-101(28)(b)(v)'s "apparent purpose" standard).  The statute is

overbroad, the Foundation argues, because as it is currently written, all unincorporated

organizations which make *any* disbursements to influence a ballot proposition will be considered

political issues committees.  *Id*. at 12 (interpreting UCA § 20A-11-101(28)(a)).

> The analysis of the constitutionality of UCA § 20A-11-101(28) begins exactly where the

analysis of UCA §§ 20A-11-101(7) and 20A-11-101(30) began, with a determination of whether

it is unambiguously campaign related.  *Buckley*, 424 U.S. at 80.  As has been repeatedly

explained, "this requirement ensures that the constitutional regulation of elections . . . does not

sweep so broadly as to become an unconstitutional infringement on protected political

expression."  *NCRTL*, 525 F.3d. at 287.

> Being designated a political issues committee in Utah imposes substantial burdens on

organizations.  Political issues committees must file a statement of registration, disclosing all of

the organizations officers, board members, and any other entities or corporations the

organization affiliates with or represents.  UTAH CODE ANN. § 20A-11-801.  Political issues

committees must also file periodic and continuous financial statements, which detail the

organization's contributors and the amount contributed.  *Id*. at § 20A-11-802.  These

burdensome disclosure requirements may provide a disincentive for many individuals and

entities to engage in activities that might classify them as a member of a political issues

committee.  Therefore, when the requirements for classification as a political issues committee

are loosely defined, otherwise protected political speech, such as true issue advocacy, may be

self-censored as individuals and entities attempt to avoid a political issues committee

designation.

Recognizing this, *Buckley* applied the same unambiguously campaign related standard to

the permissible scope of political committee regulation. *Buckley*, 424 U.S. at 79. *Buckley* held

that only those entities that are "under the control of a candidate or *the major purpose* of which

is the nomination or election of a candidate," could be designated as a political committee and

thus regulated. *Id.* (emphasis added).

Subsequent cases have affirmed *Buckley's* "major purpose" requirement. In *Fed.*

*Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986) [hereinafter *MCFL*], the

Supreme Court described political committees as "those groups whose primary objective is to

influence political campaigns," and held that a corporation could be classified as such if its

"major purpose may be regarded as campaign activity." *Id.* at 262. *See also McConnell v.*

*Federal Election Comm'n*, 540 U.S. 93, 170 n.64 (quoting *Buckley's* analysis of political

committees favorably). Similarly, the Tenth Circuit explained that under *Buckley*, "a group is

not a 'political committee' unless its 'major purpose' is to influence federal elections." *Colo.*

*Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1152 (10th Cir. 2007) (citation omitted)

[hereinafter *CRTL*].

It is clear, therefore, that only those entities whose primary purpose is to engage in

election-related activities may be constitutionally regulated as political committees. This narrow

definition "ensures that the burdens of political committee designation only fall on entities

whose primary, or only, activities are within the 'core' of Congress's power to regulate

elections," *NCRTL*, 525 F.3d at 288 (citing *Buckley*, 424 U.S. at 79), and politically protected speech is not unconstitutionally regulated.

a.       *§ 20A-11-101(28)(a)(i) - General Definition of Political Issues Committee*

Section 20A-11-101(28)(a)(i) of the Utah Election Code defines political issues committee as an entity that "makes disbursements to influence, or to intend to influence, directly or indirectly," a ballot proposition.  The court has already held that language such as "intended to influence" is impermissibly vague and must be narrowly construed to pass constitutional scrutiny.  *See supra* at 23-24.  However, Utah's attempt to regulate entities making *any* such disbursements cannot be saved.  With such a broad definition, Utah does not even attempt to comply with *Buckley's* "major purpose" requirement, and has pushed the reach of political committee regulation beyond constitutional limits.

In *CRTL*, the Tenth Circuit was presented with a Colorado statute that imposed political committee status on any entity that spent more than $200 a year to support or oppose the election of one or more candidates.  *CRTL*, 498 F.3d at 1153.  The Tenth Circuit held that this $200 trigger, standing alone, was insufficient to satisfy *Buckley's* "major purpose" requirement.  *Id.* at 1154.  So it is with Utah's $1 trigger.  "By diluting *Buckley's* test and regulating entities" that make *any* disbursement to influence a ballot proposition, Utah "runs the risk of burdening a substantial amount of constitutionally protected political speech."  *NCRTL*, 525 F.3d at 289.  Accordingly, UCA § 20A-11-101(28)(a) is unconstitutional on its face.

b.       *§ 20A-11-101(28)(b)(v) - Corporate Exception*

Section 20A-11-101(28)(b)(v) of the Utah Election Code provides an exception to the political issues committee definition for all corporations, "except a corporation whose *apparent*

34

*purpose* is to act as a political issues committee." *Id.* (emphasis added).  Section 20A-11-

101(28)(b)(v) provides no direction as to how the state of Utah will determine what a

corporation's apparent purpose is, or what activities will subject a corporation to the

requirements imposed on political issues committees.  One is left to speculate whether the phrase

"apparent purpose," as used in UCA § 20A-11-101(28)(b)(v), is limited to include only those

corporations whose stated purpose is to influence elections or whose predominant expenditures

are made for the purpose of influencing elections, as suggested by the Supreme Court.[11]  479

U.S. at 252.  Or whether it encompasses more, to include – as Utah has suggested – any

corporation generally acting as a political issues committee.  Defendant's Memo in Opposition,

p. 9, Dkt. No. 22.  No clear answers to these questions are provided.

Furthermore, a single corporation can have many "apparent purposes."  For example, the

Foundation's purposes include not only defending the rights of workers from employment

discrimination based on unionism arrangements, but also providing information to the working

public.  Even if it is true in the present case that the Foundation, in addition to these purposes,

was also expressing its support of school vouchers, it is pure speculation whether the statute

would be interpreted by the State to find support of school vouchers as the Foundation's

"apparent purpose" for the ads.  Accordingly, by using the ambiguous phrase "apparent

purpose," Utah fails to clearly mark the boundary between permissible and impermissible

speech."  *Buckley*, 424 U.S. at 41.

---

[11]In *MCFL*, the Supreme Court "suggested two methods to determine an organization's 'major purpose': (1) examination of the organization's central organizational purpose; or (2) comparison of the organization's independent spending with overall spending to determine whether the preponderance of expenditures are for express advocacy or contributions to candidates."  *CRTL*, 498 F.3d at 1152 (citing *MCFL*, 479 U.S. at 252 n.6).

If Utah is allowed to impose political committee burdens on a multi-faceted organization simply because one of its "apparent purposes" – as perceived by the state of Utah – is to influence elections, Utah will end-up regulating "a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech." *NCRTL*, 525 F.3d at 289.  The court is convinced that "*Buckley* did indeed mean exactly what it said when it held that an entity must have '*the* major purpose' of supporting or opposing [an election] to be designated a political committee." *Id*. at 288.  Therefore, because UCA § 20A-11-101(28)(b)(v) does not specifically limit political committee regulation to those corporations whose *predominant* purpose is to act as a political issues committee, or which has *the* apparent purpose to act as a political issues committee, it likewise fails constitutional scrutiny and is facially invalid.

## V.  CONCLUSION

For the foregoing reasons, the Court finds that UCA §§ 20A-11-101(7) and 20A-11-101(30) are facially valid so long as they are narrowly construed to apply only to those expenditures that unambiguously relate to the enactment or defeat of a particular ballot measure, either through express advocacy or its functional equivalent as defined by Supreme Court precedent.  Even narrowly construed in this manner, however, UCA §§ 20A-11-101(7) and 20A-11-101(30) are unconstitutional as applied to the Foundation.  The Foundation's advertisements neither expressly advocate for the enactment of school vouchers, nor are they the functional equivalent of express advocacy as defined by Supreme Court precedent.

With respect to UCA § 20A-11-101(28), the court finds that it is facially invalid.  Section 20A-11-101(28) fails to comply with *Buckley's* "major purpose" test, and in so doing runs the risk of regulating far too much ordinary political speech.

Accordingly, National Right to Work Legal Defense and Education Foundation, Inc.'s motion for summary judgment is GRANTED.

IT IS SO ORDERED.

DATED this 8th day of September, 2008.

_____
Dee Benson
United States District Judge